IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

WILLIE BOYD,                                )
                                            )
        **Plaintiff,**                      )
                                            )
v.                                          )        CIVIL ACTION 04-0825-WS-D
                                            )
PROVINCE HEALTHCARE                         )
COMPANY, INC., *et al.*,                    )
                                            )
        **Defendants.**                     )

**ORDER**

This matter is before the Court on Defendants' Motion for Summary Judgment (doc. 27). The
Motion has been fully briefed and is ripe for disposition at this time.[1]

**I.      Background.**

        **A.      *Nature of Case.***

In an Amended Complaint (doc. 19) filed on March 23, 2005, plaintiff Willie Boyd ("Boyd")
brought claims of employment discrimination against defendants Province Healthcare Company, Inc.
and Vaughan Regional Medical Center, LLC (collectively, "defendants"). Specifically, the Amended
Complaint alleged that defendants terminated Boyd's employment because of his disability, in violation
of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* (the "ADA"). (Amended
Complaint, ¶¶ 12, 14.) It was also intimated that Boyd had been subjected to disability discrimination

---

[1]      Under the terms of the operative Rule 16(b) Scheduling Order (doc. 18), defendants'
summary judgment motion and supporting materials were due on August 29, 2005. Defendants did not
submit their Motion until September 2, 2005. As properly explained in their Declaration of Technical
Difficulties (doc. 32), defendants were unable to comply with the August 29 deadline because
Hurricane Katrina struck the Gulf Coast that day, disabling this District Court's electronic filing system.
It was literally impossible for defendants to file their Motion until September 2, 2005, at which time they
promptly did so. Given these most unusual circumstances and defendants' diligence in attempting to
comply with the applicable deadline, the Motion and accompanying filings will be accepted as timely.

as to "other terms and conditions of employment," none of which were enumerated or described in the pleading. (*Id.*, ¶ 16.)  Based on the parties' filings, the singular issue confronting this Court on summary judgment is whether there are genuine issues of material fact as to whether defendants terminated plaintiff's employment because of a disability.

>    ***B.     Facts.*** [2]

>    >    *1.     Plaintiff's Employment History at the Hospital.*

Boyd came to work at Vaughan Regional Medical Center (the "Hospital") in Selma, Alabama in approximately 1985. (Boyd Dep., at 39, 52-53.)  The Hospital is owned and/or operated by defendants, and Boyd was employed by defendants at all material times.  His assigned responsibilities were to work as a janitor (euphemistically classified as an "Environmental Services Technician").  In this capacity, Boyd removed trash, stripped and waxed floors using a mop, helped other employees strip patient beds, removed linens, and engaged in various cleaning tasks in patients' rooms, such as scrubbing walls, dust-mopping televisions, cleaning bathrooms with a sponge, sweeping floors with a broom, and the like.  (*Id.* at 39-40, 54-58.)  The patient room-cleaning responsibilities were not part of Boyd's required duties; however, he volunteered to assist other workers in these tasks when the Hospital was short-handed.  (*Id.* at 62-63.)  It is undisputed that Boyd was able to perform the essential functions of his job at the Hospital without substantial difficulty despite the fact that he is missing his right arm just below the elbow because of a work-related accident dating back to September 1973.  (Boyd Dep., at 34, 40, 55-59, 74-75, 77-78.)[3]  Boyd does not wear a prosthesis

---

[2]      The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party.  *See Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir.  2004); *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1217 (11th Cir. 2005) (on summary judgment, court must view record and draw all reasonable inferences in light most favorable to  nonmoving party).  Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in his favor.

[3]      That is not to say, however, that Boyd's impairment had no effect on his ability to perform his job duties.  To the contrary, Boyd testified that "[s]ome things [he] did have difficulty with," such as hanging privacy curtains, moving furniture to strip floors, and the like.  (*Id.* at 64.)  In those circumstances, he would request assistance from other employees.  (*Id.* at 64-65.)  More generally, there is evidence in the record as to the extent to which Boyd's impairment limits such major life

or other assistive device.  Although he tried a prosthesis in 1975, he discontinued use of it shortly thereafter upon determining that he "could function better without it."  (*Id.* at 76.)

Plaintiff's 19 years of service at the Hospital were marked by strong job performance.  Indeed, throughout his employment at the Hospital, Boyd consistently received favorable evaluations.  (*Id.* at 66.)[4]  In approximately December 2003, the Hospital promoted him to the position of Environmental Services Supervisor on the day shift.  (*Id.* at 92-93; Perry Dep., at 21.)[5]  In that capacity, Boyd supervised approximately 10 employees, but otherwise performed the same job responsibilities that he had previously.  (Boyd Dep., at 94-95; Perry Dep., at 30.)  Hospital officials characterized the position as a "shift lead person" or a "working supervisor."  (*Id.* at 28-29, 65.)

2.    *The Events of February and March 2004.*

The events culminating in Boyd's separation from the Hospital commenced innocuously enough with the hiring of Don Lamar ("Lamar") as Director of Environmental Services (and Boyd's direct

---

activities as working, performing manual tasks and caring for himself.  (*Id.* at 82-91.)  Based on Boyd's testimony about the minimal impact of his impairment on certain day-to-day activities, a credible argument might be made that he is not substantially limited in any major life activities and is therefore not disabled under the ADA.  However, defendants have conceded for purposes of summary judgment that plaintiff is a qualified individual with a disability.  (Defendants' Brief, at 9-10.)  For that reason, the Court need not and will not explore the minutiae of Boyd's impairment, but will instead assume for purposes of this Order that he is in fact disabled.

[4]      During his deposition, Alfonz Earl Perry, the Hospital's Director of Human Resources, agreed that all evaluations accumulated in Boyd's personnel file were favorable.  (Perry Dep., at 46.)  Additionally, Bernice Dykes, the Hospital's Environmental Services Manager and Boyd's supervisor until December 2003, testified by affidavit that Boyd "consistently received good evaluations for his work" and "was known for being very helpful and cooperative in assisting his co-workers whenever possible."  (Dykes Aff., ¶¶ 5-6.)

[5]      This occasion actually marked the second time that Boyd had been promoted to a supervisory position.  In 1994, the Hospital elevated Boyd to the position of Environmental Services Supervisor on the night shift, which entailed an increase in pay but no substantive change to his job duties.  (Boyd Dep., at 69-70.)  Some time later, a position for an Environmental Services Technician on the day shift became available.  Boyd requested and received that position because he preferred the day shift, even though it meant relinquishing his supervisory title and compensation.  (*Id.* at 73-74.)

-3-

supervisor) in February 2004.  (Boyd Dep., at 96.)[6]  Lamar had no previous experience at the

Hospital.  (Lamar Dep., at 18.)  Boyd testified that he got along fine with Lamar, that Lamar treated

him with courtesy and respect, and that Lamar never made inappropriate comments about Boyd's

impairment.  (Boyd Dep., at 96-97.)  Boyd further testified that he did not believe that Lamar treated

him differently than any other employees.  (*Id.*)

Within a few weeks after he arrived at the Hospital, Lamar directed Boyd to arrange for his

subordinates to clean the skylights on the facility.  (Boyd Dep., at 100-01.)  The next day, Lamar

noticed that the skylights were still dirty, so he instructed Boyd personally to go clean them.  (*Id.* at

100-01; Boyd Aff., ¶ 3.)[7]  Because of his impairment, Boyd could not safely climb a tall ladder to

perform this function because he could not use one hand to balance or steady himself while cleaning the

skylights.  (Boyd Aff., ¶ 3.)  Instead of attempting this feat himself, Boyd directed other Environmental

Services employees to climb a ladder and clean the skylights, which they did.  (Boyd Dep., at 104-05.)

The record does not reflect any discussion between Boyd and Lamar over the former's ability or

inability to perform the requested assignment.  There is no evidence that harsh words were exchanged

between Boyd and Lamar over Lamar's instruction that Boyd clean the skylights, or that Lamar was

dissatisfied in any way with the solution that Boyd ultimately implemented.  Indeed, Boyd testified that

he never climbed the ladder and that he was not disciplined, fined or penalized in any way because of

---

[6]        Lamar's employment stint at the Hospital was quite short-lived.  In fact, he arrived at
the Hospital in February 2004, and resigned to move out of state just four months later in June 2004.
(Lamar Dep., at 18, 20.)

[7]        Boyd offered a ready explanation for why the skylights had not been cleaned in
response to Lamar's request the previous day.  In particular, Boyd testified that he had dispatched an
Environmental Services crew to clean the skylights, but that a Maintenance employee intercepted them
and said that Maintenance would take care of the matter because that department had a large ladder
that was well suited for the task.  (Boyd Dep., at 100-01.)  It was Maintenance's failure to follow
through with this assignment – and not any deficiency on Boyd's part – that resulted in Lamar raising
the issue a second time.

-4-

that incident.  (*Id.* at 104-05.)[8]

       At the end of Boyd's shift on March 5, 2004, Lamar told him that he was going to place Boyd

on the work schedule the following weekend to clean discharged patients' rooms in the Pediatric Ward

all by himself, without any help.  (Boyd Dep., at 98, 109; Boyd Aff., ¶ 4.)[9]  Boyd informed Lamar that

he could not perform this assignment by himself, and that "the ladies that were there that weekend, I

would get with them and we would go over there and clean the floor."  (Boyd Dep., at 98-99.)  Boyd

also explained that he was physically unable to make beds (a significant aspect of cleaning discharge

rooms) by himself because of his impairment, and that he would need help.  (*Id.* at 108-09; Boyd Aff.,

¶ 4.)  According to Boyd, his impairment would prevent him from performing other cleaning tasks on

the Pediatric Ward by himself, such as hanging cubicle curtains, cleaning air conditioning vents, cleaning

juice-stained telephone cords and the like.  (Boyd Dep., at 115-17.)  Thus, Boyd objected to Lamar

that because of his disability, he was physically incapable of cleaning the Pediatric Ward by himself.

(*Id.* at 112, 126.)  According to Boyd, Lamar was adamant that he was assigning Boyd to do it, that

Boyd would not be permitted to have assistance in this assignment, and that if he refused to do the job

he would be deemed insubordinate.  (*Id.* at 99, 125; Boyd Aff., ¶ 4.)  At some point in this discussion,

---

       [8]       Apparently, plaintiff relies on the skylight incident as evidence that Lamar was
insensitive to Boyd's impairment.  Although such an inference could reasonably be drawn, these
decidedly tepid facts are not, in and of themselves, the stuff of ADA violations.  There is no suggestion
that, for example, Boyd informed Lamar that he was unable to climb a ladder to clean the skylights.
Even if there were, there is no evidence that Lamar disregarded this information or advised Boyd he
would be fired or disciplined if he did not clean the skylights himself, notwithstanding his physical
impairment.  The skylight incident may advance plaintiff's ADA theory of liability in some marginal
fashion, inasmuch as the undisputed evidence is that it would be unsafe to require a one-armed man to
climb a tall ladder to perform cleaning duties.  (Lamar Dep., at 42; Perry Dep., at 52.)  Nonetheless,
any significance of this incident to the claims in this lawsuit is tempered by Boyd's concession that the
ladder incident simply "wasn't any big deal."  (Boyd Dep., at 108.)

       [9]       Although Lamar disputes many aspects of plaintiff's testimony regarding this meeting, he
allows that he informed Boyd that he had "an idea" to schedule Boyd to work by himself on the
pediatric floor.  (Lamar Dep., at 52.)  Lamar also testified, however, that Boyd would have been free
to call on anyone else in the Hospital to assist him in these endeavors.  (*Id.* at 54-55.)  Because
Lamar's testimony that "it was made clear that he would receive help" (*Id.*) is disputed by Boyd, it is
not credited for summary judgment purposes.

Boyd indicated to Lamar that there were "ladies" at the Hospital who could do "that kind of work." (Boyd Dep., at 114.)  Lamar responded, "you mean to tell me that's women's work?"  (*Id.*)  Plaintiff reflexively answered, "yes," because he "thought it was a dumb question" and because he was "frustrated" with the conversation with Lamar.  (*Id.* at 114-15.)[10]

Lamar then asked Boyd to accompany him to the office of Alfonz Earl Perry, the Hospital's Director of Human Resources.  (*Id.* at 124-25.)  Boyd did so.  Lamar recounted the substance of their conversation to Perry, at which point Boyd interjected that he could not clean the discharged patients' rooms on the pediatric floor all by himself, without explaining why.  (*Id.* at 125-27.)[11]  Boyd did not mention his disability in the discussion with Lamar and Perry, although he had told Lamar in their one-on-one meeting that his disability was the reason why he could not perform the assignment.  (*Id.*)  For his part, Perry believed that Boyd was capable of changing hospital bed sheets "when and if he wanted to," although the factual basis for this opinion is unclear.  (Perry Dep., at 67.)  At the conclusion of this 10 to 15 minute meeting, Perry stated, "we've got to do what we've got to do," and asked Boyd to turn in his badge and beeper, which he did.  (Boyd Dep., at 129.)  Based on Perry's request at the end of the meeting, Boyd understood that "when I give him my badge and beeper, there was no more employment," and that he was fired.  (*Id.* at 130.)  During the meeting, however, neither Perry nor

---

[10]     In his deposition, plaintiff hastened to add that he "didn't mean it as an insult," because he had been "doing whatever ladies do, like cleaning bathrooms" throughout his employment at the Hospital.  (*Id.* at 114.)  According to Boyd, "[I]f I had felt like that was women's work, you know, I wouldn't have even been employed there."  (*Id.* at 128.)  Not surprisingly, defendants' account of the "women's work" exchange is substantially different (Perry Dep., at 70), but their version of events cannot be credited on summary judgment.

[11]     Perry testified that if Lamar had instructed Boyd to work by himself in the pediatric unit on a weekend cleaning patient rooms, Perry would have been concerned and "would have probed it a little more .. [t]o kind of get an understanding as to whether or not Willie can do all the duties there." (Perry Dep., at 64, 66.)  The evidence most favorable to plaintiff reflects that this is precisely what Lamar directed Boyd to do, yet when Perry was informed of this fact, he did not "probe" any further but instead summarily collected Boyd's badge and beeper, and sent him on his way.

Lamar expressly informed Boyd that his employment was being terminated.  (*Id.* at 132.)[12]  Boyd did
not report for work on his next scheduled workday because he understood that he was no longer
employed by the Hospital.  (*Id.*)

Later that day, Lamar prepared a Personnel Action Form to document Boyd's separation from
the Hospital.  (Opposition Brief, at Exh. 2.)[13]  Multiple reviewing officials at the Hospital approved and
signed the Form as completed by Lamar.  This form states that Boyd's employment was terminated
effective March 5, 2004, indicates that he was ineligible for rehire, and recites the following as the
reason for his dismissal: "Employee decided to resign due to his belief that he should not have to clean
patient rooms after stating it was 'woman's work.'" (*Id.*)[14]  Defendants' contention that Boyd resigned

---

[12]     Boyd's position is that Perry's request that Boyd turn in his beeper and badge was the
functional equivalent of telling him that he was fired.  Without his badge and beeper, he reasons, Boyd
could not have clocked in or otherwise come into work.  (*Id.* at 132.)

[13]     This exhibit is a copy of a form, which plaintiff submitted on summary judgment without
authentication or verification.  Generally, courts ruling on Rule 56 motions may consider only admissible
evidence.  *See Denney v. City of Albany,* 247 F.3d 1172, 1189 n.10 (11th Cir. 2001) ("In
considering a summary judgment motion, a court may only consider evidence that is admissible or that
could be presented in an admissible form.") (citation omitted).   Documents must generally be properly
authenticated to be considered at summary judgment, unless it is apparent that they can be reduced to
admissible, authenticated form at trial.  *Bozeman v. Orum,* 199 F. Supp.2d 1216, 1222 (M.D. Ala.
2002).  Those requirements were not followed as to this exhibit.  Nonetheless, there appears to be no
dispute that this exhibit is in fact a true and accurate copy of the Personnel Action Form; as such, it is
apparent that this document can be reduced to admissible, authenticated form at trial, and the Court will
consider it on that basis.

[14]     The form also includes the following recital under the heading of "Comments": "Mr.
Boyd is a knowledgeable employee that has a extremely negative attitude and a poor productivity level.
Mr. Boyd failed miserably at providing supervisory decisions, and would not aid this facility in its efforts
to improve." (*Id.*)  If, in fact, Boyd had voluntarily resigned, rather than being involuntarily discharged,
it is difficult to understand why Lamar would have gone out of his way to take a gratuitous swipe at his
job performance, attitude, and decision-making skills.  Moreover, Lamar acknowledged in his
deposition that he had never spoken with Boyd about any of these alleged performance deficiencies,
much less reprimanded him for them.  (Lamar Dep., at 62, 65, 69, 82-83.)  Given Boyd's sterling
record and glowing performance evaluations during his 19 years on the job, Perry allowed that "[i]t was
kind of strange" that Lamar abruptly reported so many serious failings in his performance.  (Perry Dep.,
at 73.)  Prior to Boyd's last day on the job, Perry had received no documentation or other indication

-7-

is bolstered by Perry's testimony that Boyd stated that he would quit before he did the "women's work" assigned by Lamar.  (Perry Dep., at 71.)  Again, however, Perry's account of the March 5 meeting is not credited on summary judgment to the extent that it conflicts with plaintiff's.

## II.    Summary Judgment Standard.

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).   However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment.  *Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004).

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent.  *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004).  Rather, "the summary judgment rule applies in job discrimination cases just as in other cases.  No thumb is to be placed on either side of

---

from Lamar or anyone else of any shortcomings in Boyd's performance, attitude, or supervisory acumen.  (*Id.* at 77-78.)  Perry also disagreed with Lamar's decision to label Boyd ineligible for rehire.  (*Id.* at 83.)  Nonetheless, Perry did not follow up to investigate these discrepancies because he "just didn't think [he] needed to."  (*Id.* at 76.)

the scale." *Id.* at 1086 (citation omitted).

## III.   Analysis.

In support of their Motion for Summary Judgment, defendants proffer three legal arguments, to-wit: (a) Boyd cannot establish a *prima facie* case under the ADA because he was not subjected to an adverse employment action; (b) defendants held a good faith, honest belief that Boyd had resigned; and (c) defendants had a legitimate nondiscriminatory reason for firing Boyd, in any event, because of his insubordination in refusing to perform assigned work and dubbing such assignments "women's work." Each of these theories for Rule 56 relief shall be addressed in turn.[15]

### A.   *Plaintiff's* **Prima Facie** *Case Under the ADA.*

In this Circuit, "to establish a *prima facie* case of employment discrimination under the ADA, a plaintiff must demonstrate that (1) he has a disability, (2) he is a 'qualified individual,' which is to say, able to perform the essential functions of the employment position that he holds or seeks with or without reasonable accommodation, and (3) the defendant unlawfully discriminated against him because of the disability." *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1226 (11th Cir. 2005); *see also*

---

[15]      In reviewing defendants' briefs, the Court observes that the footnotes set forth therein are not compliant with the Local Rules. In particular, defendants utilize a tiny font in those footnotes, in violation of the specifications of LR 5.1. Similarly, the Court notes that plaintiff has placed complete transcripts of multiple depositions into the record. In so doing, plaintiff runs afoul of Local Rule 5.5(c), which provides that "If discovery materials are germane to any motion or response, only the relevant portions of the material shall be filed with the motion or response." *Id.* By attaching such extraneous documents, plaintiff's counsel obliges the Court to wade through dozens of pages of superfluous materials in search of relevant portions of the transcript. This practice is inappropriate. *See generally Witbeck v. Embry Riddle Aeronautical University, Inc.*, 219 F.R.D. 540, 547 (M.D. Fla. 2004) ("That judges have no duty to scour the file in search of evidence is an obvious corollary to the requirement that parties specifically identify the portions of the case file which support their assertions regarding whether genuine issues remain for trial."); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) (federal courts "are wary of becoming advocates who comb the record of previously available evidence and make a party's case for it"); *Nicholas Acoustics & Specialty Co. v. H & M Const. Co.*, 695 F.2d 839, 846-47 (5th Cir. 1983) ("practical constraints on the time of a judge make it impossible for the judge to examine a record of even moderate size with such finitude as to be both exhaustive and exhausting"). The Court will not scour these deposition transcripts *sua sponte* for uncited evidence that might lend support to the plaintiff's position.

*Collado v. United Parcel Service, Co.*, 419 F.3d 1143, 1149 (11th Cir. 2005); *Carruthers v. BSA Advertising, Inc.*, 357 F.3d 1213, 1215 (11th Cir. 2004).[16]

Implicit in and subsumed under the third element is a requirement that a plaintiff show adverse employment action. *See Doe v. Dekalb County School Dist.*, 145 F.3d 1441, 1448 (11th Cir. 1998) (describing "adverse employment action" concept as "an essential element of a *prima facie* ADA case"). There is no reasonable dispute that involuntary termination of employment constitutes an "adverse employment action" for ADA purposes. *See id.* (citing as examples of adverse employment actions "termination, demotion, reduction in pay, loss of prestige, or diminishment of responsibilities"); *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) (declaring that an adverse employment action equates to "an ultimate employment decision, such as discharge or failure to hire"); *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) (to constitute an adverse employment action, "the employer's action must impact the terms, conditions or privileges of the plaintiff's job in a real and demonstrable way," such that a reasonable person in the circumstances would have viewed it as "a ***serious and material*** change in the terms, conditions, or privileges of employment").

Defendants maintain that Boyd is unable to satisfy his *prima facie* obligations because he

---

[16] Both logic and common sense suggest that the third element of the ADA *prima facie* case should not be phrased as requiring a plaintiff to prove disability discrimination; after all, that is the ultimate issue in the case, and the inherent difficulty of proving same is the reason animating the *McDonnell Douglas* burden-shifting analysis in the first place. *See Brandon v. Lockheed Martin Aeronautical Systems*, --- F. Supp.2d ----, 2005 WL 2420515, *1 (N.D. Ga. Sept. 29, 2005) (persuasively explaining that Eleventh Circuit's formulation of third element "is incorrect because if a plaintiff has proved that he was discriminated against because of his disability, he has actually proved his entire case (and he is entitled to have judgment entered in his favor), not simply made a *prima facie* showing. The third prong should be a showing of adverse employment action--the same as in other discrimination suits."). A more sensible formulation of the third element, consistent with the purposes of *McDonnell Douglas*, would be to oblige a plaintiff to show, as part of his *prima facie* case, that he was subjected to adverse employment action under circumstances suggesting a causal link to his disability. As the *Brandon* court observed, the Eleventh Circuit has consistently applied the third element in this manner, notwithstanding the imprecise and inaccurate language used in reciting that element. This Court will apply the third element in conformity with the Eleventh Circuit's practice, albeit not its exact language in outlining that test.

cannot establish that he was subjected to an adverse employment action. This argument necessarily turns on the events of March 5, 2004. If Boyd has mustered sufficient evidence from which a reasonable factfinder could conclude that the Hospital involuntarily terminated his employment that day, then this element of the *prima facie* test is satisfied. If, however, the evidence taken in the light most favorable to Boyd reflects that he voluntarily resigned, then he cannot meet the "adverse employment action" threshold and cannot withstand summary judgment.[17]

In support of the "no adverse action" basis for their Rule 56 Motion, defendants offer only a conclusory statement that Boyd "was not terminated for refusing to make beds, but instead resigned." (Motion, at 2.) Conspicuously absent from defendants' submissions is any analysis showing why the summary judgment record compels such a finding. The Court finds that it does not. Although the precise substance of the March 5 meeting among plaintiff, Lamar and Perry is hotly contested, the following facts emerge when the evidence is viewed in the light most favorable to plaintiff: (i) Lamar informed Boyd that he would be responsible for cleaning the pediatric floor by himself the following weekend; (ii) when Boyd balked, stating that his impairment prevented him from making beds and offering to work with "the ladies" to complete these tasks, Lamar emphatically stated that Boyd would have no assistance, that Lamar was telling Boyd to perform this assignment personally, and that Boyd's refusal to accept the assignment would amount to insubordination; (iii) Lamar escalated the confrontation by taking Boyd to Perry's office, where they continued this debate; (iv) at the end of that discussion, Perry stated, "we've got to do what we've got to do," and asked for Boyd's badge and beeper, which he turned in; (v) after relinquishing his badge and beeper, Boyd was unable to clock in or

---

[17]     Defendants devote several pages of their principal brief to developing an argument that neither the skylight assignment nor the proposed weekend pediatrics assignment cross the adverse employment action threshold. (Defendants' Brief, at 11-13.) Plaintiff's counsel readily admits that such events "may not rise to the level of an adverse action." (Plaintiff's Brief, at 12.) Instead, plaintiff takes the position that the two challenged assignments are not ADA violations in and of themselves, but that they are evidence of Lamar's discriminatory animus towards Boyd. (*Id.*) These facts will be considered exclusively on that basis; therefore, the Court need not rule on whether the skylight and pediatrics assignments constitute adverse employment actions because plaintiff does not contend that they are separate ADA violations.

out of work; and (vi) Lamar immediately prepared termination paperwork stating that Boyd "decided to resign," deeming him ineligible for rehire, and reciting in scathing terms a list of never-before-aired performance deficiencies (*e.g.*, "extremely negative attitude," "poor productivity level," "failed miserably") that appear irreconcilable with the 19 years of favorable performance evaluations in plaintiff's file.

Unquestionably, a reasonable jury could interpret these facts as establishing that the Hospital fired Boyd. Defendants' undeveloped argument to the contrary cannot prevail.[18] Accordingly, the Court finds that Boyd has proffered sufficient evidence which, if believed by a factfinder, would establish that the Hospital fired him on March 5, 2004. Because involuntary discharge is obviously an adverse employment action, a corollary to this finding is that Boyd has established the requisite adverse employment action necessary to pursue his ADA termination claim. Boyd has made a *prima facie* showing of disability discrimination, and defendants' Motion is unavailing to the extent that it purports to argue otherwise.

### B.    Defendants' Legitimate Nondiscriminatory Reasons.

Courts routinely apply the familiar *McDonnell Douglas*[19] burden-shifting framework to ADA actions in which the plaintiff seeks to prove liability via circumstantial evidence. *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004); *Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001). Under this framework, once a plaintiff establishes a *prima facie* showing, "the defendant-employer must articulate a legitimate, non-discriminatory reason

---

[18]    Defendants argue that Boyd's position that he was fired results from an "egocentric and subjective" construction of the facts. (Defendants' Brief, at 17.) Whatever merit these labels may (or may not) have, the Court's finding today is that a factfinder could reasonably infer from these facts that Boyd was fired. Besides, defendants offer no alternative rational interpretation of Perry's instructions to Boyd that he turn in his beeper and badge on his way out of the meeting. With no beeper or badge, Boyd had no way of clocking in or knowing that the Hospital was trying to contact him. If it looks like a duck and quacks like a duck, then a reasonable jury could certainly conclude that it is in fact a duck, notwithstanding defendants' efforts to portray it as a pigeon or a whooping crane.

[19]    *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973).

for the challenged action." *Wascura*, 257 F.3d at 1242. "If the employer does so, the burden shifts back to the plaintiff to introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1457 (11th Cir. 1997) (citations omitted). A plaintiff may establish pretext "either directly, by persuading the court that a discriminatory reason more than likely motivated the employer, or indirectly, by persuading the court that the proffered reason for the employment decision is not worthy of belief." *Hall v. Alabama Ass'n of School Boards*, 326 F.3d 1157, 1166 (11th Cir. 2003); *see also Wilson*, 376 F.3d at 1088 (plaintiff may prevail "by either proving that intentional discrimination motivated the employer or producing sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer, which permits, but does not compel, the trier of fact to find illegal discrimination"). The ultimate burden of persuasion remains with the plaintiff. *See E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1273 (11th Cir. 2002).

Defendants offer two alternative legitimate nondiscriminatory reasons for the challenged personnel action. First, they assert that Lamar and Perry "honestly believed Plaintiff resigned rather than performing what he considered to be 'women's work.'" (Motion, at 2.) Second, they maintain that they had a legitimate nondiscriminatory reason to fire Boyd because of his insubordinate refusal to work in the pediatrics unit and his gender-biased attitude. (*Id.*)

### 1. The "Honest Belief" Defense.

In an effort to rebut Boyd's *prima facie* case of disability discrimination, defendants first argue that Lamar and Perry honestly believed that Boyd had resigned. (Defendants' Brief, at 17.) To support this contention, defendants point to testimony from Lamar and Perry professing their belief that Boyd had resigned. When asked in their respective depositions whether Boyd was fired, Lamar testified, "No. He actually quit," while Perry responded, "No, he was not." (Lamar Dep., at 78; Perry Dep., at 71-72.) Defendants also rely on the Personnel Action Form, on which Lamar wrote, "employee decided to resign ...." Finally, Perry testified that Boyd indicated during the March 5

-13-

meeting that he would quit before performing the assigned "women's work."  (Perry Dep., at 71.)[20]

The case law unquestionably establishes that an employer may satisfy its *McDonnell Douglas* burden of production by reference to an honest, good faith belief in the reason for an employee's dismissal, and that such a reason is not proven pretextual even if that honest, good faith belief proved incorrect or mistaken.  *See E.E.O.C. v. Total System Services, Inc.*, 221 F.3d 1171, 1176-77 (11th Cir. 2000) (affirming summary judgment for defendant where defendant stated that employee was fired for lying in investigation, and plaintiff offered no evidence that defendant lacked a good faith belief that the employee had lied); *see generally Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999) ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct."); *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002) ("We are not interested in whether the conclusion is a correct one, but whether it is an honest one.").  Indeed, "[a]n honest belief in the nondiscriminatory reason offered by the decision-maker will be sufficient even if the reasons are foolish, trivial, or even baseless."  *Smith v. AT&T Broadband Network Solutions, Inc.*, 2002 WL 370217, *12 (N.D. Ill. Mar. 8, 2002).

That said, merely articulating a belief that Boyd resigned, in and of itself, does not give defendants a free pass from liability.  Simply mouthing, "I believed he quit," is insufficient, and the Court imputes no talismanic significance to those words.[21]  In a slightly different context, the Eleventh Circuit

---

[20]      Defendants incorrectly assume that the honesty of their belief is gauged by viewing the evidence in their favor.  It is not.  Rather, on summary judgment, an assessment of whether defendants honestly believed Boyd resigned must turn on the evidence viewed most favorably to plaintiff.

[21]      A contrary rule would produce truly absurd results.  Imagine a situation where Employee X arrives at work 10 minutes early, says good morning to his supervisor, and clocks in right on time, a fact documented by his time card.  The employer fires Employee X for a discriminatory reason, then decides it needs a cover story, so it documents the reason for the termination as being that plaintiff was late to work that day.  In ensuing litigation, the supervisor testifies, "I honestly believed that Employee X arrived to work late that morning."  Under such circumstances, the employee must be allowed to probe the veracity of that statement and point to the countervailing facts as proof that the supervisor could not in fact have held such an honest belief, thereby raising an inference of pretext.  If the employee were prohibited from doing so, then an employer could circumvent liability in even the

has evinced no compunction about rejecting a "good faith belief" defense that lacks any legitimate factual basis.  *See Lowe v. Alabama Power Co.*, 244 F.3d 1305, 1308 (11ᵗʰ Cir. 2001).  As another appellate court has explained, "in order for an employer's proffered non-discriminatory basis for its employment action to be considered honestly held, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made.  If the employer is unable to produce such evidence to support its employment action, then the 'honest belief' rule does not apply."  *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6ᵗʰ Cir. 1998).  "Even if the employer is able to make such a showing, the protection afforded by the rule is not automatic" because "once the employer is able to point to the particularized facts that motivated its decision, the employee has the opportunity to produce proof to the contrary."  *Id.* (citations omitted).

Simply put, then, the question posed by defendants' "good faith belief" defense is whether the record in the light most favorable to Boyd can support a reasonable inference that Lamar and Perry did not honestly believe that he had resigned.  The Court answers this question in the affirmative.  As discussed *supra*, Boyd's evidence shows that Lamar informed him that he would be required to clean the discharge rooms in the Pediatric Unit by himself and without assistance, that Lamar rebuffed Boyd's protestations that he was physically unable to complete that assignment, that Lamar told Boyd it would be insubordination if he refused this task, and that Perry demanded Boyd's badge and beeper after being apprised of the situation.[22]  If those facts are accepted as true, as they must for Rule 56 purposes, then it tests the limits of reason and common sense to maintain that Lamar and Perry could have honestly interpreted those circumstances as meaning that Boyd had voluntarily resigned.  In other words, a reasonable jury considering the summary judgment record could find that Lamar and Perry

---

most egregious of circumstances by professing an honest belief in circumstances that no reasonable employer could have believed.  In short, a defendant's articulation of an "honest belief" cannot immunize the defendant from scrutiny as to whether that belief was, in fact, honestly held.

[22]     Defendants have proffered no evidence that Boyd ever stated, "I quit," or words to that effect during the meeting.  Thus, at best from defendants' standpoint, the record shows that Boyd stated during the meeting that he would quit before he worked the pediatrics assignment.  That is a slender reed, indeed, on which to predicate a purported "honest belief" that Boyd resigned.

did not honestly believe that Boyd had resigned, but instead fired him and concocted a *post hoc* rationalization for that decision.  Based on these facts, a reasonable jury could find that the stated reason for Boyd's dismissal (*i.e.,* an "honest belief" that he had resigned) was pretextual.  A jury question is plainly presented here.

> 2.      *The "Insubordination" / "Women's Work" Defense.*

In the alternative, defendants assert that even if they fired Boyd, they had a legitimate nondiscriminatory reason for doing so.  As formulated by defendants, "[p]laintiff's unilateral refusal to work on the pediatrics unit because it would require him to perform 'women's work' was insubordination and sufficient justification for Defendants to terminate his employment."  (Defendants' Brief, at 18.)

Once again, defendants' argument is waylaid by the conflicting inferences in the summary judgment record regarding the events of March 5, 2004.  Viewing the evidence in the light most favorable to Boyd, he did not unilaterally refuse to work on the pediatrics unit because it would require him to perform "women's work."  To the contrary, plaintiff's unequivocal testimony is that Boyd informed Lamar that he could not perform the requested assignment by himself, without assistance, because of his disability.  In plaintiff's version of the facts, Boyd proceeded to suggest to Lamar that he would make arrangements with "the ladies" to clean the unit with them, at which time Lamar responded, "You mean to tell me that's women's work?"  Boyd answered "yes" to the question, but only out of frustration with what he perceived as a ridiculous query from his supervisor given that Boyd had spent the better part of two decades performing such tasks at the Hospital.

If Boyd's account of the March 5 meeting is accepted by a jury, then he was not insubordinate in any way, and he did not reject the pediatrics unit assignment as "women's work."  Under plaintiff's iteration of the facts, he made clear to his supervisor that he was objecting to the assignment not because he viewed that task as demeaning or gender-specific, but instead because he was physically incapable of performing it within the parameters specified by Lamar.  Thus, if plaintiff's version of the facts is credited, then a reasonable jury could readily deem defendants' alternative explanation pretextual inasmuch as (a) Boyd was not insubordinate, and (b) Boyd's opposition to the assigned job

had nothing to do with a "women's work" characterization and everything to do with his physical impairment.[23]  Beyond these inadequacies, a reasonable jury could conclude that defendants' failure to apply its progressive discipline policy and their decision unceremoniously to fire a long-term employee based on a single incident of perceived insubordination was in violation of Hospital policies and therefore pretextual.  (Perry Dep., at 12, 19-20, 82-84.)

Ultimately, the fatal flaw in defendants' theories for relief on their Motion for Summary Judgment is that they overlook the he-said/he-said nature of the evidence.  Review of the deposition transcripts reveals two starkly different portrayals of what transpired during the meetings between Boyd and Lamar, and among Boyd, Lamar and Perry on March 5, 2004.  Defendants' contentions may be quite reasonable, and even compelling, if their version of those facts is accepted.  However, the Court cannot adopt defendants' contested facts on summary judgment, but is instead constrained to credit plaintiff's account.  Under plaintiff's iteration of the facts, he was a long-term Hospital employee who was widely praised for his positive attitude and helpful demeanor.  Then, his brand-new supervisor made two unreasonable demands of him that, at a minimum, displayed a gross insensitivity to plaintiff's obvious physical impairment.  When plaintiff objected that his disability precluded him from meeting the second of those demands, his supervisor accused him of insubordination and sexism and marched him to human resources.  There, the human resources director listened to the supervisor's account, then instructed plaintiff to relinquish his beeper and badge, without which plaintiff could not work at the Hospital.  After plaintiff turned in these items, the supervisor prepared a termination form stating that plaintiff had resigned, declaring him ineligible for rehire, and raising a host of alleged severe performance

---

[23]       In an effort to bolster this flagging argument, defendants again revert to the "good faith belief" defense, insisting that Perry and Lamar "honestly and in good faith believed that Plaintiff refused the prospective job assignment because he believed it to be women's work."  (Defendants' Brief, at 18.)  Under plaintiff's iteration of the facts, they could not honestly have held such a belief because Boyd made clear to Lamar that his objection to the assignment rested on his physical inability to perform it.  Lamar inflamed the situation by injecting a "women's work" query, and Boyd responded to it flippantly, in a sarcastic "yeah right" manner that could not reasonably be construed as a true belief that this assignment was suitable only for women, particularly given Boyd's track record of willingly performing similar tasks for the Hospital for nearly two decades.

inadequacies that had never previously been documented and that directly contradicted plaintiff's uniformly glowing evaluations in his 19 years on the job. The human resources director found this newly-raised withering criticism of plaintiff to be "kind of strange" and disagreed with the "ineligible for rehire" designation, but failed to conduct any investigation or to explore the matter further. From those facts, a reasonable jury could certainly find that Lamar fired Boyd because of his disability, then formulated a "voluntary quit" story to conceal his actions.

      **C.**     ***Other Issues.***

      Although the foregoing discussion is sufficient to resolve the Motion for Summary Judgment in its entirety, the Court briefly pauses to address several tangential issues briefed by the parties. In doing so, the undersigned's sole purpose is to explain why these ancillary matters are not germane to this case, so that there can be no confusion as to which issues are and are not properly joined for trial.

      **1.**     ***Purported Retaliation Claim.***

      Plaintiff's counsel devotes a substantial chunk of the opposition brief to developing a claim of retaliation under the ADA. (Plaintiff's Brief, at 10-13.) Plaintiff maintains that Boyd was discharged for engaging in statutorily protected expression by requesting a reasonable accommodation. Plaintiff's brief properly identifies the elements of an ADA retaliation *prima facie* case, but it overlooks the critical fact that no such claim is at issue in this lawsuit. The Complaint and Amended Complaint do not reasonably place defendants or the Court on notice of Boyd's intent to pursue a retaliation claim. Furthermore, the time for amending the pleadings expired back on April 29, 2005, and a retaliation claim cannot be soldered onto a Complaint through a summary judgment brief. A brief opposing summary judgment is not a platform for *de facto* amendments to a Complaint. *See Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."); *see also Franz v. Five Rivers MetroParks*, 254 F. Supp.2d 753, 758-59 (S.D. Ohio 2002) (claim for relief not presented in complaint but raised for first time in opposition to summary judgment motion will not be recognized); *Marten v. Yellow Freight System, Inc.*, 993 F. Supp. 822, 829 (D. Kan. 1998) ("A claim not raised in the complaint and initially asserted in a response to a summary judgment motion is not properly

before the court."); *Caribbean Wholesales & Serv. Corp. v. U.S. JVC Corp.*, 963 F. Supp. 1342, 1359 (S.D.N.Y. 1997) ("[Plaintiff] in effect is apparently attempting to add a claim never addressed, or even hinted at, in the complaint. Such a step is inappropriate at the summary judgment stage, after the close of discovery, without the Court's leave, and in a brief in opposition to a dispositive motion.").[24]

Plaintiff's Complaint and Amended Complaint are clearly confined to claims of wrongful termination on the basis of a disability, in violation of the ADA. Nothing in those pleadings even hints that Boyd seeks to bring an ADA retaliation claim in addition to or instead of an ADA termination claim. Because no ADA retaliation cause of action has been properly pleaded, plaintiff cannot introduce such a claim now. Plaintiff is hereby placed on notice that Boyd will not be permitted to proceed on an ADA retaliation theory at trial because such a claim is not part of this lawsuit.

2.     *Purported Constructive Discharge Claim.*

In their initial brief, defendants theorize that plaintiff might wish to proceed on a "constructive discharge" theory. For that reason, defendants' brief offers a detailed explanation of the legal fallacies inherent in any attempt to invoke constructive discharge here, even though they acknowledge that no such theory is propounded in the Complaint or Amended Complaint. (Defendants' Brief, at 13-14.) Such anticipatory briefing is rarely fruitful, but typically results in a litigant shadowboxing with himself over an issue that his adversary never raised and never intended to raise. Such is the case here, as plaintiff's brief states that Boyd "does not contend that he was constructively discharged and makes no argument to support such a claim." (Plaintiff's Brief, at 20.) Thus, constructive discharge is not now and has never been at issue in this dispute.

3.     *Purported Mixed-Motive Defense.*

Third and last in the list of phantom issues briefed by the parties is plaintiff's attempted rebuttal

---

[24]     *See generally Jones v. Southcorr, L.L.C.*, 324 F. Supp.2d 765, 774 n.9 (M.D.N.C. 2004) (plaintiff cannot pursue claims of retaliation and non-payment of wages where such claims were not included in EEOC Charge, not alleged in Complaint, and were not the subject of discovery); *Johnson v. Fulton Concrete Co.*, 330 F. Supp.2d 1330, 1346 (N.D. Ga. 2004) (explaining that summary judgment on hostile work environment claim would be appropriate where plaintiff failed to allege such a claim in EEOC Charge or Complaint).

of the mixed-motive defense.  (Plaintiff's Brief, at 16-17.)  For reasons that are unclear, plaintiff urges the Court to reject the *McDonnell Douglas* burden-shifting standard and instead to apply a "mixed-motive" analysis pursuant to *Desert Palace v. Costa*, --- U.S. ----, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), which he contends changed the burdens of proof and persuasion in discrimination cases.[25]

This argument is misguided.  The mixed-motive defense (*i.e.*, that a defendant would have made the same decision even in the absence of a discriminatory consideration) is an affirmative defense that a defendant may raise or waive.  *See, e.g., Pulliam v. Tallapoosa County Jail*, 185 F.3d 1182, 1184 (11th Cir. 1999) ("Defendants in [discrimination] cases may prove as an affirmative defense that they would have reached the same employment decision even in the absence of bias.").  Confronted with evidence that an adverse employment action was motivated by an unlawful discriminatory consideration, a defendant may "respond by arguing that the plaintiff has failed to prove that the impermissible reason was even a motivating factor, or by proving that the defendant would have taken the same action for a permissible reason alone, or by pursuing both tactics."  *Id.* at 1186.  The point is that it is a defendant's prerogative to decide whether it wishes to advance a mixed-motive defense, whether it wishes to "go for broke" by denying that the unlawful factor was a consideration in its decision at all, or whether it wishes to do both.  A plaintiff cannot force a defendant to argue a mixed-motive defense if that defendant chooses instead to defend the case as one in which the discriminatory factor was not a consideration in the challenged employment decision at all.

--------------------------------------------------

[25]     Plaintiff's construction of *Desert Palace* as overturning and supplanting *McDonnell Douglas* has not been adopted in this circuit.  *See Cooper v. Southern Co.*, 390 F.3d 695, 725 n.17 (11th Cir. 2004) (rejecting suggestion "that *Desert Palace* may spell the end of the *McDonnell Douglas* burden-shifting analysis," reasoning that "the *Desert Palace* holding was expressly limited to the context of mixed-motive discrimination cases," and pointing out that "after *Desert Palace* was decided, this Court has continued to apply the *McDonnell Douglas* analysis in non-mixed-motive cases"); *see also Sanders v. City of Montgomery*, 319 F. Supp.2d 1296, 1314 (M.D. Ala. 2004) (holding "that *Desert Palace* did not alter or eliminate the *McDonnell Douglas* paradigm employed in deciding motions for summary judgment in cases based on circumstantial evidence"); *Herawi v. State of Alabama Dept. of Forensic Sciences*, 311 F. Supp.2d 1335, 1346 (M.D. Ala. 2004) ("there is nothing in *Desert Palace* that undermines the continued usefulness of *McDonnell Douglas* to trial courts, in either single- or mixed-motive cases based on circumstantial evidence, for assessing Title VII liability").

Here, defendants have made a strategic decision not to invoke the mixed-motive defense, but instead to defend this action on the grounds that the protected factor was not considered at all. Defendants are within their rights to select this tack for their defense, to the exclusion of the mixed-motive defense. By attempting to wedge this case into a mixed-motive analysis, plaintiff seeks to override the defense strategy and compel the consideration of an affirmative defense that defendants have elected to forego. Such a request is improper and will not be granted. The mixed-motive defense is not at issue in this action.

**IV.    Conclusion.**

For all of the foregoing reasons, defendants' Motion for Summary Judgment (doc. 27) is **denied**. Construed in the light most favorable to plaintiff, the record supports a reasonable inference that defendants fired him and that their stated nondiscriminatory reasons for doing so were pretexts for discrimination.

DONE and ORDERED this 22nd day of November, 2005.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE